[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION RE: MOTION FOR MODIFICATION OF JUDGMENT OF DISSOLUTION AS TO CUSTODY
I.
NATURE OF PROCEEDINGS
The defendant, C. Marc Powell, has moved to modify Judgment of Dissolution dated March 10, 1983, so as to vest sole custody and primary residence of his two minor children in himself.
 II.
FACTS
The plaintiff, Angela Millon Powell, and the defendant, C. Marc Powell were married on April 23, 1973. Two children were born of the marriage, Matthew David Powell, born January 20, 1978 and Brad Millon Powell, born May 29, 1981. The parties were divorced in Litchfield Court on March 20, 1983. The matter was heard as a limited contested one (i.e., financial issues only). The Court, at that time, found each party was an excellent parent and granted joint custody of the children to both parties, primary residence with the plaintiff mother, and reasonable, liberal and flexible visitation rights to the defendant father. Subsequent events made that conclusion less than prophetic.
Between 1983 and today's date some of the promises CT Page 10989 inherent in the statement of the Court that both parents are excellent have, in fact, borne fruition. The two sons have developed good grades and participated as excellent athletes in such sports as football and hockey. But there has been a darker side shown that ultimately reached its peak in the attempted suicide of the mother in October of 1992 while this case was being heard by this judge.
During the years following the dissolution of marriage in 1983, the husband was remarried for a short period of time; and dated two other women until his present engagement to Debra, his current fiancee, whom he has been seeing for about three years. The plaintiff mother also was remarried once for a short period of time. Her remarriage was characterized by violent encounters and excessive drinking all of which required intervention by the police. Since then, she has also dated at least one other man. When the father was not dating other women the relationship of the father to the children appeared to the outside world as idyllic and even was so characterized by the mother. The father had the children every weekend, many times during the week, and had the option of dropping in to see the children during the week; even having dinner as a family group. The spigot of good relations was turned off every time the father tried to integrate the children with a person he was seeing. The visitation was either cut off, reduced, or terminated by the mother as if the father were a social pariah for inflicting his post-divorce women friends on his children.
During this period of time, but after the divorce between the mother and her second husband, when the mother and children were living in Glastonbury, the father bought a home in Glastonbury and permitted the mother and the children to live there in lieu of his paying his child support although the rental value of the home was in excess of the child support. In addition, he paid substantial sums in the thousands over and above his court ordered obligation to enable his children to participate fully in an active community athletic program. Despite that, the mother still terminated or reduced visitation when the father was dating other women after the divorce. In 1987 the file was transferred from CT Page 10990 Litchfield County to Hartford County because both parties were then living in Glastonbury, and father filed a post-judgment motion which raised the denial of his visitation. The file does not reflect any action on that motion.
It was during one of the black periods that one of the few physical confrontations between the father and the mother resulted in both being seen by Dr. Gerald Faris. This was at the request of the local G.A. Court. Dr. Faris was chosen by recommendation of a friend of mother's. Dr. Faris said this, in part, about the mother:
"There is an intensity about her partially made up of anger over what appear to be reasonable concerns as well as some sense of a deeper, perhaps painful level of tension that contributes to the intensity of her presentation and at times might be experienced by others as excessive, provocative, or threatening. I have not had sufficient opportunity to fully evaluate Mrs. Powell or to further check out these hypotheses. What I can say is that my observations as just described taken together with her family history and her history of turbulent adult relationships would suggest the possibility that she is struggling with what is sometimes seen as borderline features of personality. For example, there is deep inner turmoil, repeatedly conflicted interpersonal relationships, some unintegrated rage patterns and difficulty in maintaining a consistent personal and work history."
With regard to the husband, Mr. Powell, Dr. Faris had this, in part, to say:
"Mr. Powell is attracted to women who are needy and warm who took the initiative to engage him in some way. These relationships were not likely to survive. They were inherently poor choices because they were based on his misperceptions of them".
Dr. Faris then explains that he did, in fact, see Mr. Powell later at Dr. Faris' request so that he could work on that problem. And he felt that father was successful in coming to terms with his tendency to CT Page 10991 respond as a rescuer to needy and dependent women.
Again, in sharp relief to the outside perception of an idyllic divorced household, Matthew Powell, the oldest son in the family, was seen at the Institute of Living from September of 1987 to February of 1989. The family was seen as having strengths. But family sessions are described as throwing into relief Mrs. Powell's parenting difficulties due to her own family of origin experiences. It was recommended that Mrs. Powell be seen in individual therapy with family sessions as needed. It was expected that this would better enable her to meet her children's emotional needs. Her family origin experience is described as one of alcoholism and abuse. Mrs. Powell indicated to the social worker that she had a high tolerance for alcohol and that alcohol became a problem after her second marriage ended. Matt, the oldest boy, was depressed at the time but both boys expressed fears of abandonment including the worry that mother might die.
The perceived idyllic life pattern continued to show cracks when Matt required therapy from one, Dr. Gerald Goodman for four months in 1990 because of depression related to a teenager who killed himself.
Approximately three years ego the father met Debra who is now his fiancee. For the first time, the pattern related to visitation, which had developed, seemed to stop. Initially, the two women, mother Angela Powell, and fiancee Debra, appeared to like each other. Visitation occurred without hitch. The fiancee's two children by a prior marriage appeared to get along well with the Powell children. The mother, Angela Powell, in fact, arranged for her children to sleep over at the fiancee's house. On the surface everything appeared to be smooth until a trip to Ottawa where Brad, the youngest child, was scheduled to be in a tournament.
Mr. Powell and Debra, his fiancee, decided to take all the children to Ottawa for the tournament. Angela Powell did not have car insurance because she hadn't paid the bill. So, Debra, the fiancee, lent her money for insurance so that she could drive to Ottawa. The mother, Angela Powell, still had financial problems CT Page 10992 in going. So, the father agreed to pay for her room; Debra paid for the room in which Marc and she occupied, and Marc paid for all the meals of the Powell children. However, this idyllic trip quickly encountered cracks because of a dispute over discipline of the Powell children between the fiancee and Angela. Shortly after that trip the visitation problem patterns reoccurred. Mrs. Powell, in testimony, acknowledged after the incident, that she told the children that she ought to spend more time with them on the weekends. As a result, visitation diminished and the old problems were resurrected causing the defendant father to file this motion for custody.
After motion was filed on September 25th, 1991, Dr. David Mantell, Clinical Child Psychologist, was appointed to do a custody evaluation on behalf of the Court with the defendant who was in a better economic condition at that time to pay the costs. Attorney Donna Murphy was appointed as attorney for the minor children (Jones, J. — 10/21/91). On May 15, 1992 Dr. Mantell completed his report to the Court which encompassed approximately a hundred and fifty pages. His examination of the issues included interviews of all the parties, children, psychological testing, examination of police reports, examination of other counseling reports, interviews with people suggested by the parties. He concludes that the father be awarded sole legal custody of the two children. Visitation with the mother is more problematical and are contained in the attached Appendix A.
Some of the reasons for Dr. Mantell's conclusion are stated as follows: "It is my conclusion that the mother confuses her own unresolved family of origin problems and superimposes these conflicts upon the lives of her children and their relationships with others. She does this when she herself feels threatened in her power position with the children and also when she perceives herself as threatened as the primary object of the children's affection. Angela Powell claims neutrality, but it is my impression that she factually encourages the boys to rebel against the father. The inability of the children and particularly Matthew to take a point of view that is independent and different CT Page 10993 from the mother was also recorded during the Institute of Living sessions as well as by myself and others. The Institute of Living record clearly indicates that the mother encourages the boys to feel sad over the father's past and anticipated future relationships with women and this occurs despite the fact that the record also reflects the knowledge by the mother of her own, parallel difficulties with her children, especially with Matthew, and of Matthew's general insecurity and conclusion of relative impoverishment and disfavor vis a vis his brother and others in the affections of his mother". And further:
"The decision of Angela Powell, however, to support whatever complaints her son may have had at the time about his father and about Debra Heinz, does not appear to me to have been motivated by a desire to advance Matthew's interests but rather to advance her own. It is my opinion that whatever grievances the children may have had against their father and against Debra Heinz have been greatly blown out of proportion and inflated by the mother for the purpose of punishing the father and for the purpose of excluding Debra Heinz from his life and also from the lives of the children. In this quest, I believe the mother has greatly exceeded the prerogatives that flowed from her primary position of responsibility for the children and also exceeded the scope of her authority as a joint custodial parent. From the standpoint of parenting in general, I think it was incorrect for her not to have supported the father in his attempts to socialize his children. I think her decisions were basically selfish ones and were not designed to promote the children's interests. I also believe that what the mother has done is to systematically involve the children in her own emotional problems and in so doing has done great damage to them. This result is most unfortunate in view of the commendable and significant job the mother has done on behalf of the children in so many other respects".
His report also chronicles a series of happenings that occurred after the father's motion, which are in part, related to Dr. Mantell's findings and noted in Table A of his report: CT Page 10994
 9/26/91 Angela Powell complained to the Glastonbury police about the father being at football practice when she arranged for a neighbor to pick up the children (the father had been at children's practice for years).
 10/1/91 Angela Powell complained to the Glastonbury police that the father was at her home trying to take Brad without her permission. She stated to the police that the father had "no type of visitation rights" (inaccurate information).
 10/8/91 Angela Powell complained to police that father was at her residence without her permission. The boys confirmed to the police that father came over just to check up about the next weekend. Angela Powell told the police that his visitation was only on weekends (not accurate)
 10/18/91 Mother, Angela Powell, complained that the fiancee, Debra, assaulted her at a hockey game. Police found no probable cause. Owner of the arena confirmed that no assault took place.
 10/22/91 Mother, Angela Powell, called the Glastonbury police complaining harassment saying that the husband was calling to talk on the phone to the boys and that was a violation of her privacy (that prior phone relationship between boys and father was of long standing).
 12/15/91 Angela Powell called police again complaining that the father had walked up the driveway to speak to one of the boys during the week while she was not there saying that this violated her rights.
 1/13/92 Mother, Angela Powell, goes to the police again. This time she claims that the fiancee, Debra, had assaulted her son Matt CT Page 10995 on December 27th by slamming a car door on him. On December 27th the father and Debra took both the boys to Troy, New York for hockey. They were there several days after the alleged car incident. No arrest was made as a result of this complaint and Dr. Mantell concludes that the complaint was not believable.
 3/6/92 Angela Powell filed a complaint that the father had struck her son Brad in the head. Again, no arrest was made. Father pulled son off the back of a younger son of his fiancee at a hockey rink when the son had attacked his fiancee's younger child from the rear. In the course of removing the son from the back his son kept flailing away.
 4/3/92 Again, Angela Powell complained to the East Haven Police at a hockey rink about harassment because the father tried to talk to his son about visitation, the son being Brad. The police officer asked Mr. Powell to leave the arena because of this request, which Mr. Powell did.
 4/3/92 Again, on April 3rd, 1992, Angela Powell made a complaint to the Glastonbury police that her sons fear the father but that he continues to call them and drive around near the house.
 4/4/92 Marc Powell asked the police to accompany him to the house so that he could pick up the children for the weekend visitation. Angela Powell denies to the police that the husband had custody of the children on weekends (a false representation).
 4/15/92 Without the knowledge of her attorney, without the knowledge of the children's attorney, without the knowledge of the father's attorney, and by not filling in that portion of the form which provides CT Page 10996 for the names of attorneys for any parties concerned with the case, the mother filed a pro se application for restraining order relief under the Family Violence Statute claiming that her children were in fear of the father and thereby obtained an exparte order suspending visitation. In her application she asked that the father not be permitted within a hundred yards of the children.
 4/17/92 Angela Powell went to the South Windsor arena, used the restraining order to cause the police to remove the father from the arena despite the fact that he was a coach of his son's team and despite the fact that he was unaware of the exparte order. The police did not realize that her request that the father not come within a hundred yards of the children was denied. This latter event was all accomplished at the time that Dr. Mantell was attempting to interview the father jointly with the children. Note: (order later vacated by the Court without hearing).
When Dr. Mantell finished his report he was not able to complete a final interview with the father and children. In addition, he discovered that the mother and children were seeing a therapist by the name of Dr. John DeGiovanni, PhD. He was denied access to John DeGiovanni by the mother and by Dr. DeGiovanni. After Dr. Mantell's report was published, the children reportedly wished another attorney. Accordingly, on July 14, 1992, Attorney Frank Santy was appointed as attorney to represent their ostensible wishes. Attorney Murphy was retained as guardian ad litem for the children to act as she perceived their best interests (Kaplan, J.).
When the Court commenced trial, it discovered Dr. Mantell's lack of access to Dr. DeGiovanni. At that time, it was represented to this court that Dr. DeGiovanni was solely the children's therapist so they had a safe haven to talk to him without parental CT Page 10997 knowledge. It turned out that that representation was not true. After the court ordered the disclosure by Dr. DeGiovanni and access by Dr. Mantell to him directly, it was discovered that the mother, Angela Powell, had been referred to him by her employer, Aetna, in January of 1991, and that he dealt with her as well as the children. It was also discovered that he functioned, in his words, as a crisis intervener. Shortly after this discovery other layers of new material were obtained in the middle of the trial — reports from Aetna Counseling services, a report of a psychiatrist by the name of Dr. Rothschild who prescribed prozac and zanax for Mrs. Powell's depression. And finally, after her attempted suicide Hartford Hospital reports were made available. Dr. Mantell reviewed all the material including Dr. DeGiovanni's reports and notes, the Hartford Hospital reports, Dr. Rothschild's notes, etcetera. He testified that his conclusions after receiving that data were not only the same but in many respects reconfirmed and reemphasized.
The court has examined the many voluminous exhibits in this case including the report of Dr. Mantell and his notes. The court has heard the testimony of the parties, some of the experts including Dr. Mantell, Dr. DeGiovanni, Dr. Faris, as well as the doctors from the Institute of Living who testified as to Mrs. Powell's most recent suicide attempt. The court concurs in Dr. Mantell's conclusion that the best interest of the minor children are that the defendant father have custody. This case has been characterized by massive manipulation, deception, and exaggeration by the mother in an attempt to destroy the relationship between the children and their father whenever she perceives that her power position is threatened. What is even worse is that she has manipulated and used her children and made them co-conspirators, at times, in this endeavor and thus damaged them by involving them in her own emotional problems.
I do not find Angela Powell credible. She lied to her employer about outside employment but obtained absolution because of her mental condition; she lied on her financial affidavit; she lied in obtaining an exparte restraining order; she lied to the police numerous times about her former husband; she allowed her attorney to misrepresent Dr. DeGiovanni's relationship to her and her CT Page 10998 children when she knew otherwise; she misrepresented a restraining order to the police so as to have her former husband kicked out of the arena when he was coaching his own son's team; she involved her sons in making false complaints to the police about their father; she involved herself in the discharge of her children's first attorney then denied it on the stand; she has not even been candid to her own therapist in not reporting to him her earlier suicide ideation (that suicide ideation took place as early as May 22, 1992 in her statement to a nurse at Aetna Life Insurance, and earlier if her husband were believed).
The court is aware that the children have expressed a wish to have primary residence with their mother. That desire was expressed to the court personally by Matthew with the permission of all parties. Their attorney has proposed a joint legal custody with primary and principal residence of the minor children with the mother and substantial visitation similar to current visitation spelled out in his recommendation and report. This court is aware that Section 46b-56(b) provides as follows: "in making or modifying any order with respect to custody or visitation the court shall be guided by the best interests of the child, in giving consideration to the wishes of the child if he is of sufficient age and capable of forming an intelligent preference". The court is also aware, both from its own experience in juvenile court and divorce court and from professionals in the field of child development
 "that a child may become deeply attached to a parent who is seriously inadequate, disturbed, or abusive, so that in some cases it is a disadvantage for the child to be in the care of the psychological parent. Leonard 
provence, "The Development of Parent-Child Relationships and the Psychological Parent;" 53 Conn. B.J. 320, 327, (1979). While psychological parenting is thus one indicator of the best interests of a child, a court has an independent responsibility to assure itself of the suitability of the parent to whom the child is primarily attached. Cf. In re Juvenile Appeal (Anonymous), 177 Conn. 648, CT Page 10999 667-668 (1979)."
Seymour v. Seymour, 180 Conn. 705, 711-712 (1980) Although the children here appear to be primarily attached to the mother, this record is replete with evidence of the mother's problems that seriously affect her judgment. Her continued parenting in that manner will have deleterious long term effects on both children, including continued destruction of the relationship of the father to the children. It should be noted that the guardian ad litem, a respected counsel, who was not limited to an advocacy role, supports the defendant father's custody modification.
The court has also heard from Dr. John DeGiovanni who functioned as a crisis intervener for the wife and children opined that the children should remain in the custody of mother. I do not credit his opinion on that issue with much weight. First, he failed to do the necessary investigation into the issues relevant to that decision; and second, he allowed himself to be placed in a conflict position, his acting as crisis intervener for both mother and children in a custody dispute. I believe he was co-opted by the mother. In his own words he was not an individual therapist for either. The court is glad that he finally made that choice and is now functioning only as a therapist for the mother. In that capacity he indicated to the court that the mother still presents short-term risk of suicide particularly if a decision is rendered against her position. He has also stated she has long-term needs of psychotherapy, one year or more, related to her anger and that her tendency to overreact could be related to post-traumatic stress reactions based upon early childhood experiences of abuse and alcoholism.
In view of the potential suicide risk, and perhaps other risks, because the court has decided the custody issue in favor of the movant, defendant father, the court wishes to have further argument on the transitional period as well as the nature of visitation between mother and children. The court is inclined to establish visitation because the court believes that would be in the best interest of the children but only under the proper safeguards. The court is also quite CT Page 11000 aware that the mother should also have long-term involvement with her children. The past has demonstrated that both the plaintiff mother and defendant father have contributed substantially to many of the good things in the children's lives. It is the hope of the court that with proper treatment and therapy the mother can more fully play an integral role in the children's lives. The children, through appropriate means such as a therapist, should be made aware that the mother needs the time to make herself whole.
The court also needs to hear further about the costs of the guardian ad litem and counsel for children before deciding the financial issues raised in this case. Visitation and financial issues to be determined after further argument.
The defendant's motion to modify custody is granted.
HERBERT BARALL JUDGE, SUPERIOR COURT
APPENDIX A
1. The matter of the children's place of residence is less clear cut. My recommendation is that the father consult with experts of his choice regarding residential issues. I think it is wise that the children be allowed to finish the academic year in Glastonbury. Options for the children include remaining in Glastonbury under the primary custodial and residential care of their father, moving to West Hartford to join the father and his fiance in a blended family, and also might include the option of Matthew moving on to a residential educational placement that would free him from the pressures of day-to-day contact with his parents and from the loyalty conflicts that have done so much damage to him while Brad joins his father in the father's residence of choice.
2. Visitation by the children with their mother is likely to be a problematic subject, more so for Matthew I suspect than for Brad. The amount of time given to the mother and children for their contact should be dosed according to the judged ability of the mother to seek treatment for her difficulties and to cooperate with the decisions reached by the Court. I think CT Page 11001 the children require protection from the mother's influence to the extent that that influence is not exercised in the children's interest. I respect the relative feelings of powerlessness voiced by the father and observed in the children when it comes to asserting themselves against the mother's wishes. Her hold over them is extremely powerful and is likely to continue to operate at a strong level even in the absence of custodial and residential authority.
3. It is essential that the father have mental health consultation services available for himself and the children for the aftermath problems that have resulted from this chronically dysfunctional system and its acute, recent expression. It is also essential that the mother enter into intensive, individual therapy in order to address and learn to control the excessive behaviors that she has manifested before and during the course of this custody struggle. I expect that this will require a long term treatment that will include periodic reports to the Court regarding her progress and her ability to manage contacts with her children and with her former husband in a way that clearly is beneficial to the children.